**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **ASH GROUP OF FLORIDA, INC., ET AL.** | |
| **Plaintiffs,** | **24-cv-3300 (ALC)** |
| -against- | **OPINION AND ORDER** |
| **FLORA GROWTH CORP. and FLORA GROWTH U.S. HOLDING CORP.,** | |
| **Defendants.** | |

**ANDREW L. CARTER, JR., United States District Judge:**

Hassan Rakine, acting as Sellers' Representative on behalf of ASH Group of Florida Inc. ("ASH"), Just Brands USA Inc. ("Just Brands USA"), FMMD Network ("FMMD"), LLC, SSGI Financial Services, Inc. ("SSGI") and Mitha Management Group LLC ("Mitha") (collectively "Plaintiffs"), brings this action against Flora Growth Corp. ("FLGC") and Flora Growth U.S. Holdings Corp. (collectively "Defendants") based on violations of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b–5 as well as common law breach of contract, breach of the covenant of good faith and fair dealing, and fraud claims.

Defendants now move to dismiss Plaintiffs' Amended Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the reasons outlined below, Defendants' motion to dismiss the Amended Complaint is **GRANTED** without prejudice.

## BACKGROUND

### I.    Factual Background

Plaintiffs are Florida-based companies and corporations. ECF No. 26 ("Am. Compl.") ¶¶ 9–14. Defendant FLGC is an Ontario, Canada-based corporation that claims principal executive offices in Fort Lauderdale, Florida. *Id.* ¶ 16–17. Defendant Flora Growth U.S. Holdings Corp. is a Delaware-based corporation resident in Delaware. *Id.* ¶ 21.

Before February 24, 2022, ASH, Just Brands USA, SSGI and FMMD owned 100% of the issued and outstanding equity interests in Just Brands LLC ("Just Brands"), a Florida limited liability company. *Id.* ¶ 28. Also before February 24, 2022, ASH owned 75 percent and Mitha owned 25 percent of the issued and outstanding equity interests in High Roller Private Label LLC ("High Roller"), a Delaware limited liability company. *Id.* ¶ 29. Together, Just Brands and High Roller owned the JustCBD brand and associated operations. *Id.* ¶ 30. JustCBD became a market leader in the consumable hemp derivatives market, manufacturing hundreds of products and selling produces to stores across the United States, Europe, and South America. *Id.* ¶ 31.

Defendants sought to acquire JustCBD and, in so doing, allegedly made material misrepresentations to Plaintiffs to induce a sale of the JustCBD business to Defendants. *Id.* ¶ 33. Defendants presented an expansion plan relying on cultivating cannabis in Colombia and selling CBD and THC-containing products around the world. *Id.* ¶ 34. Defendants repeatedly represented to Plaintiffs and to the public that they could grow cannabis in Colombia at much lower costs than their competitors, claiming that they could cultivate high-quality cannabis at an "industry-leading" cost of 6 cents per gram, which they touted as being 60% lower than the production costs of their next closest competitor. *See id.* ¶¶ 33–40.

During their meetings with Plaintiffs, Defendants touted their farm which had optimal growing conditions, but Plaintiffs submit that the farm was just a typical farm located in a remote area, making it unsuitable for large-scale commercial production. *Id.* ¶ 41. Moreover, Defendants' actual costs consistently exceeded 6 cents per gram and Plaintiffs allege Defendants knew they could not achieve the 6 cent-cost it had represented to Plaintiffs. *Id.* ¶ 42. Additionally, Defendants claimed they were industry leaders in cannabis research and development, but in fact they had only developed a few products, none of which were industry-

leading.  *Id.* ¶ 43.  Defendants also repeatedly represented they were poised for immediate and

sustained financial growth, but Plaintiffs allege that they in fact used acquisitions to mask their

failure to grow.  *Id.* ¶ 46.  Relying on those material representations, Plaintiffs sold the JustCBD

business to Defendants; but for those misrepresentations, Plaintiffs would not have sold

JustCBD.  *Id.* ¶¶ 45–46.

Pursuant to a Purchase Agreement effective February 24, 2022, Flora Growth U.S.

Holdings acquired 100% of the issued and outstanding equity interests in both High Roller and

Just Brands from Plaintiffs, thereby acquiring JustCBD.[1]  *Id.* ¶ 47; *see also* ECF No. 1 Ex. 1.

Under the Purchase Agreement, FLGC agreed to pay $16 million in cash consideration (subject

to adjustment) and also to issue 9.5 million shares of FLGC common stock (subject to

adjustment).  Am. Compl. ¶ 48.  Moreover, Defendants agreed to provide additional shares of

FLGC common stock to account for the failure of the FLGC stock price to exceed $5.00 as well

as to account for any subsequent dilutive actions.  *Id.* ¶ 48.  On February 24, 2022, FLGC stock

closed at or about $1.85 per share.  *Id.* ¶ 49.  The parties anticipated that the share price for

FLGC stock would grow to and eventually exceed $5.00 per share, making the 9.5 million shares

of share consideration provided for under the Purchase Agreement worth $47.5 million.  *Id.* ¶ 50.

The Purchase Agreement included an Additional Shares provision (Section 2.7 of the

Purchase Agreement) intended to ensure that Plaintiffs received the full share consideration of

---

[1] Alongside the pleadings, a Court may also consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit" of which a court may take judicial notice.  *Sgalambo v. McKenzie*, 739 F.Supp.2d 453, 470 (S.D.N.Y. 2010) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)).  Additionally, when deciding a motion to dismiss, a court may "take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents."  *Staehr v. Hartford Fin. Servs. Grp.*, Inc., 547 F.3d 406, 424-25 (2d Cir. 2008); *see also Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 352 (2d Cir. 2022) (finding that a district court's judicial notice of an investment analyst report was appropriate because it was "relevant" to litigants' arguments on a motion to dismiss).

$47.5 million contemplated by the parties, thereby assuring Plaintiffs the full value of the $63.5 million purchase price ($16 million in cash consideration plus $47.5 million in share consideration). *Id.* ¶¶ 48, 50–51.  In a Form 6-K filed on February 28, 2022, FLGC explained:

> The Agreement provides that if at any time during the 24 months following the Closing (the "Reference Period"), the five-day volume weighted average price ("VWAP") per share of Flora's common shares as quoted on the Nasdaq Capital Market fails to equal or exceed the Share Price, then promptly following the Reference Period, Flora shall issue a number of additional Flora common shares (the "Additional Shares", together with the Flora Shares, the "Share Consideration") to Sellers so that the Share Consideration has an aggregate value of $47,500,000, less the value of any Escrow Shares relinquished or sold out of the share escrow described in the preceding paragraph, determined by a formula set forth in the Agreement.

*Id.* ¶ 52.  To give effect to their intention of assuring Plaintiffs at least $47.5 million in share consideration, the Parties agreed that FLGC was obligated to provide Plaintiffs with Additional Shares of FLGC stock if the "the five-day volume weighted average price ('VWAP') per share of Parent Common Stock as quoted on the NASDAQ Capital Market fails to equal or exceed the Share Price," which was set at $5.00.  *Id.* ¶ 53.  Indeed, the mechanism would be determined using a formula set forth in section 2.7(a) of the Purchase Agreement:

> (a) If at any time during the twenty-four (24) month period following the Closing Date (the "**Reference Period**"), the five-day volume weighted average price ("**VWAP**") per share of Parent Common Stock as quoted on the NASDAQ Capital Market fails to equal or exceed the Share Price, then promptly following the twenty-four (24) month anniversary of the Closing Date, Parent shall issue Parent Common Stock (such shares, or any shares issued in accordance with Section 2.7(b), "**Additional Shares**") to Sellers in an aggregate amount equal to the difference between:
>
> (i) an amount equal to (A) (x) $47,500,000, less (y) the product of the total number of Relinquished Shares multiplied by the Share Price, less (z) the product of the total number of any Delivered Escrow Shares multiplied by the greater of (I) the volume-weighted sales price for all Delivered Escrow Shares sold during the Reference Period and (II) the highest five-day VWAP per share of Parent Common Stock as quoted on the NASDAQ Capital Market between the Closing Date and the date of the sale of such Delivered Escrow Shares, divided by (B) the highest five-day VWAP at any time during the Reference Period; and

> (ii) an amount equal to (A) 9,500,000 less (B) the total number of (x)
> Relinquished Shares and (y) Delivered Escrow Shares.

*Id.* ¶ 54 (emphasis in original).  Additionally, the Plaintiffs were protected from dilution in

Section 2.7(e) of the Purchase Agreement:

> In the event of changes in the outstanding Parent Common Stock or in the capital
> structure of Parent by reason of any stock dividend, stock split, reverse stock split,
> an extraordinary corporate transaction such as any recapitalization,
> reorganization, merger, consolidation, combination, exchange, or other relevant
> change in capitalization occurring after the Closing Date, the number of
> Additional Shares (and the associated calculation of number of Additional Shares)
> deliverable pursuant to this Section 2.7 will be equitably adjusted as to the
> number (and price calculation) or of Additional Shares to the extent necessary to
> preserve the economic intent of the Parties.

*Id.* ¶ 55.  Finally, the Purchase Agreement also included an escrow provision which was intended

to protect Defendants from third-party claims.  *Id.* ¶ 56.  Of the 9.5 million shares Defendants

were required to provide at closing, 3,166,667 were placed in an escrow account according to a

Share Escrow Agreement in the Purchase Agreement.  *Id.*; *see also* ECF No. 1, Ex. 2.  Such

shares were held to satisfy Plaintiffs' potential obligations, including revenue shortfalls,

indemnification claims, or liabilities and defense costs for certain lawsuits pending at the time of

closing.  Am. Compl. ¶ 57.

   After the transaction closed, FLGC issued a press release touting JustCBD's success,

highlighting that JustCBD had generated $28 million in revenue and $7 million in EBITDA in

the 2020 fiscal years.  *Id.* ¶ 59.  FLGC also represented that JustCBD was expected to accelerate

FLGC's growth and provide immediate contributions to revenue and earnings, as well as to open

opportunities for international expansion.  *Id.* ¶ 60.

   However, the price of FLGC stock has consistently fallen since the transaction closed.

*Id.* ¶ 62.  On December 8, 2022, as part of a registered direct offering, FLGC issued 12.5 million

additional shares of stock at 40 cents per share and also offered warrants for 500,000 shares with a 44 cent strike price. *Id.* ¶ 63. The impact of this was a dilution of FLGC stock and the interest Plaintiffs' received in FLGC. *Id.*

On June 9, 2023, there was a reverse stock split for FLGC stock to prop up the share price, which was completed using a 1:20 ratio whereby every 20 shares of existing FLGC Stock was converted into a single share. *Id.* ¶ 64. Under Section 2.7(e) of the Purchase Agreement, the impact of a stock split must be equitably adjusted when determining the amount of Additional Shares owed to Plaintiffs; therefore, Plaintiffs allege the pre-reverse stock split share numbers and prices should be converted into their equivalent after adjusting for the stock split. *Id.* ¶ 65. Adjusting for the stock split, the initial share consideration of 9.5 million shares is now 475,000 in post-reverse split shares and the initial target share price of $5.00 is now $100.00 for post-reverse split shares. *Id.* ¶ 66.

On September 20, 2023, FLGC issued additional shares as part of another registered direct offering. *Id.* ¶ 68. FLGC issued 1,369,000 shares at $2 per share along with warrants for 1,369,000 shares of Parent Common stock with a strike price of $2.50 and warrants for 54,760 shares of Parent Common stock with a strike price of $2.39. *Id.* ¶ 68.

On February 24, 2024 (the two-year anniversary of the closing), FLGC should have issued to Plaintiffs 182,889.25 additional shares of FLGC common stock and paid Plaintiffs more than $38 million to complete the acquisition of JustCBD. *Id.* ¶ 3. Defendants failed to do so. *Id.* On March 27, 2024, Rakine (as Plaintiffs' representative) notified FLGC of its obligation to pay the additional shares and cash consideration required under the adjustment mechanism, but FLGC did not respond to that notice or pay the additional consideration. *Id.* ¶ 4.

As of the filing of the Amended Complaint, FLGC traded at less than $2.00 per share despite the reverse stock split, amounting to $98 below the adjusted target price for the stock even without accounting for the dilution. *Id.* ¶ 69. Plaintiffs submit that they are entitled to additional shares and cash compensation pursuant to various provisions in the Purchase Agreement because the share price never hit the target price. *Id.* ¶¶ 70–80. Indeed, the highest five-day VWAP reached during the Reference Period was $43.60 (adjusting for the stock split). *Id.* ¶ 71. Moreover, Plaintiffs demand that Flora Growth U.S. Holdings Corp. permit the release of escrowed shares of stock to be released to Plaintiff ASH as required by the Purchase Agreement. *Id.* ¶¶ 81–87. Finally, Plaintiffs submit that FLGC did not disclose its liability to Plaintiffs (the additional shares and cash consideration required under the adjustment mechanism) or Plaintiffs' asserted claims to the public in subsequent public filings. *See id.* ¶¶ 88–93.

## II.    **Procedural Background**

On April 30, 2024, Plaintiffs filed their Complaint. ECF No. 1. On June 14, 2024, Defendants filed a letter requesting a premotion conference in anticipation of a motion to dismiss the Complaint. ECF No. 15. On June 20, 2024, Plaintiffs filed their response. ECF No. 16. Following a premotion conference and the submission of a joint status report, Plaintiffs filed an Amended Complaint on July 17, 2024. ECF No. 26. On July 22, 2024, Defendants filed a letter requesting a premotion conference in anticipation of a motion to dismiss the Amended Complaint. ECF No. 17. On July 25, 2024, Plaintiffs filed their response. ECF No. 28. On August 5, 2024, the Court denied the request for a premotion conference and set forth a briefing schedule. ECF No. 30.

On August 26, 2024, Defendants filed their motion to dismiss the Amended Complaint and their opening brief.  ECF Nos. 31, 32.  On September 9, 2024, Plaintiffs filed their opposition.  ECF No. 34.  On September 16, 2024, Defendants filed their reply.  ECF No. 35.

## STANDARD OF REVIEW

When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).  However, the Court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Claims should be dismissed when a plaintiff has not pleaded enough facts that "plausibly give rise to an entitlement for relief."  *Id.* at 679.

A claim is plausible "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).  While not akin to a "probability requirement," the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (citing *Twombly*, 550 U.S. at 556).  Accordingly, where a plaintiff alleges facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557). The Court's function on a motion to dismiss "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient."  *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

When a plaintiff has alleged securities fraud claims, the complaint is subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud or mistake." Moreover, "Rule 9(b) requires plaintiffs asserting securities fraud claims to (1) specify the statements that the plaintiffs contend were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements made were fraudulent." *In re Skechers USA, Inc. Sec. Litig.*, 444 F.Supp.3d 498, 511 (S.D.N.Y. 2020). (quotation, citation, and alteration omitted).

The PSLRA holds private securities plaintiffs to an even more stringent pleading standard. Under the PSLRA, a plaintiff must "(1) specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading; and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (internal citation and quotation marks omitted) (quoting 15 U.S.C. § 78u-4(b)). In analyzing scienter, Courts consider "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323 (emphasis in original). To determine whether an inference of scienter is strong, the court must decide whether "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

These heightened pleading standards—when viewed together with the more general standards applicable to Rule 12(b)(6) motions to dismiss under *Twombly* and *Iqbal*—make clear that "plaintiffs must provide sufficient particularity in their allegations to support a plausible

inference that it is more likely than not that a securities law violation has been committed." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 570 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).

## DISCUSSION

Defendants seek to dismiss Plaintiffs' federal securities fraud claim, which is based on the theory that Defendants knew they did not intend to provide additional share consideration as required by the Purchase agreement. Defendants also seek dismissal of Plaintiffs' common law claims, which are based on a theory that (1) Defendants never had an intention to provide additional share consideration and (2) that Defendants knowingly misrepresented themselves as cannabis industry leaders prior to the execution of the Purchase Agreement.

For all counts, Defendants argue Plaintiff has not pleaded with particularity all of the necessary elements for their claims as required by Fed. R. Civ. P. 9(b). In response, Plaintiffs argue that they have pleaded each claim with sufficient particularity to survive Defendants' motion. The Court considers the Parties' arguments in turn.

### I.    Plaintiffs' Federal Securities Claim Fails for Failure to State a Claim

Plaintiffs' first cause of action against Defendants is based on a violation of Section 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b–5. Section 10(b) of the Securities Exchange Act of 1934 prohibits using or employing, "in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance." 15 U.S.C. § 78j(b). Under Rule 10b-5, promulgated thereunder, it is unlawful for any person, directly or indirectly, by the use of any means specified in Section 10(b):

> (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of

business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  To state a private civil claim under Section 10(b) and Rule 10b-5, a plaintiff must prove "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection with the purchase or sale of securities; (4) Plaintiff's reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'"  *GAMCO Inv'rs, Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)).

To maintain a Section 10(b) claim at the dismissal stage, the complaint must establish that Defendants "made a statement that was misleading as to a material fact."  *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 207 (S.D.N.Y. 2020) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011)).  When claiming falsity, the alleged material misstatement must have been "false at the time it was made."  *In re Lululemon*, 14 F. Supp. 3d at 571.  To establish materiality, a Plaintiff must establish "whether the defendants' representations, taken together and in context, would have misled a reasonable investor."  *Rombach v. Chang*, 355 F.3d 164, 172 n.11 (2d Cir. 2004) (citation and internal quotation marks omitted).

Plaintiffs' Section 10(b) claim is premised on the theory that Defendants never intended to provide them the additional share consideration, an allegedly false promise upon which Plaintiffs relied in selling their business to Defendants.  "'[T]he failure to carry out a promise made in connection with a securities transaction is normally a breach of contract' and does not justify a Rule 10b-5 action."  *Gurary v. Winehouse*, 235 F.3d 792, 801 (2d Cir. 2000) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993)).  To state a viable claim, Plaintiffs must show that Defendants "secretly intended not to perform or knew that he could not perform[]" at the time that the promise was made.  *Gurary*, 235 F.3d at 801.  "However,

although Rule 9(b) allows a plaintiff to aver intent generally, a Section 10(b) complaint nevertheless must allege facts that raise a strong inference of fraudulent intent." *CSI Inv. Partners II, L.P. v. Cendant Corp.*, 180 F. Supp. 2d 444, 452–53 (S.D.N.Y. 2001) (quoting *Mills*, 12 F.3d at 1176).

In other words, Plaintiffs must provide some basis for establishing that, at the time they entered into the Purchase Agreements, Defendants did not intend to provide the share consideration to Plaintiffs. *See id.* at 453. Defendants argue that Plaintiffs assert no particularized facts from which a strong inference of fraudulent intent can be raised. ECF No. 32 at 7. Indeed, the only direct evidence supporting Defendants' intent is the fact that Defendants have yet to issue the share consideration, which is not enough. *See CSI Inv. Partners II*, 180 F. Supp. 2d at 453 ("The simple fact of nonperformance of a promise is insufficient to raise an inference of fraud.") (internal quotation marks omitted) (quoting *Fisk v. SuperAnnuities, Inc.*, 927 F.Supp. 718, 725 (S.D.N.Y. 1996)).

Rather, Plaintiff argues that there is circumstantial evidence of Defendants' intent, pointing to allegedly false statements made by FLGC about its ability to produce cannabis at 6 cents per gram; its research and development capabilities; and its farming operations. *See* ECF No. 33 at 7. Plaintiffs argue in their opposition that all these misrepresentations induced Plaintiffs into selling JustCBD to Defendants. *Id.* However, Plaintiffs do not plead with particularity *why* the statements are false. *Rombach*, 355 F.3d at 174 (concluding that "expressions of puffery and corporate optimism do not give rise to securities violations" and "plaintiffs must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so").

More importantly, these statements may very well be facts supporting an inference that Defendants knew that they lacked capability to run their business, but they do not support an inference that—at the time the Parties entered into the Purchase Agreement—Defendants had formed an intent to not provide the share consideration to Plaintiffs. *See CSI Inv. Partners II*, 180 F. Supp. 2d at 453–54 (allegations concerning the impact of accounting irregularities on defendant's operation of acquired company were not a basis for inferring that defendant had formed its intention not to perform before the closing). Indeed, "[i]f after the closing, [Defendants] changed [their] intentions and decided . . . not to [perform], this may provide a basis for a breach of contract claim, but it cannot form the basis for a fraud claim." *Id.* at 454.

As further evidence of Defendants' intent, Plaintiffs point to an October 5, 2022 prospectus in connection with a direct offering in which FLGC issued 12.5 million additional shares. ECF No. 33 at 13. In the prospectus, FLGC did not disclose their additional share consideration liability to Plaintiffs, which Plaintiffs argue is evidence of Defendants' intent to not provide the additional share consideration. *Id.* But in the Second Circuit, facts occurring after an alleged misstatement are not probative of fraudulent intent at the time the statement was made. *See Mills*, 12 F.3d at 1176 (2d Cir. 1993). Taken collectively, the facts alleged by Plaintiff do not give rise to a strong inference that Defendants did not intend to live up to their promises. Therefore, Plaintiffs' federal securities claim is dismissed without prejudice.

## II.    Plaintiffs' Common Law Claims Are Dismissed Because Plaintiffs Failed to Demonstrate Complete Diversity

Having dismissed the federal securities claim, the Court now turns to Plaintiffs' state law claims, but arrives at an impasse. Federal district courts are courts of limited jurisdiction and must confirm that they have subject matter jurisdiction over matters before them. *See Durant,*

*Nichols, Houston, Hodgson & Cortese–Costa P.C. v. Dupont*, 565 F.3d 56, 62–63 (2d Cir. 2009).  With respect to Plaintiffs' federal securities violation claim, the Parties did not dispute federal question jurisdiction, thus the Court did not need to engage in jurisdictional analysis.  But here, where federal question jurisdiction is dissolved, a Court could only have subject matter jurisdiction through the diversity of citizenship statute, 28 U.S.C. § 1332.

For a court to exercise diversity jurisdiction, there must be complete diversity of citizenship between all plaintiffs and all defendants.  *Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 117–18 (2d Cir. 2014).  "Furthermore, it is well established that the party seeking to invoke jurisdiction under 28 U.S.C. § 1332 bears the burden of demonstrating that the grounds for diversity exist and that diversity is complete." *Herrick Co. v. SCS Commc'ns, Inc.*, 251 F.3d 315, 322 (2d Cir. 2001) (alteration, citations, and internal quotation marks omitted).

Plaintiffs (all Florida residents) allege that Defendant Flora Growth U.S. Holdings Corp. is a Delaware citizen and that Defendant FLGC is an Ontario corporation that also lists on its SEC filings its "Principal Executive Offices" an address in Fort Lauderdale, Florida.  Am. Compl. ¶¶ 9–15, 16–22.  But Plaintiffs submit that FLGC "is not a citizen of Florida for the purpose of diversity of citizenship."  *Id.* ¶ 20.  In support of this contention, Plaintiffs note that FLGC's two executive officers reside in Panama and Ontario; that former counsel for FLGC informed them that a Fort Lauderdale address that was formerly reported as the "Principal Executive Offices" in a March 28, 2024 10-K was merely an abandoned warehouse; and that no officer or executive works in its "Principal Executive Offices."  *Id.* ¶¶ 16–19.

But Plaintiffs also allege that former counsel for FLGC "reported the correct office address" which is now listed as the "Principal Executive Offices" in FLGC's SEC filings and

that one FLGC director lives in Florida.  The evidence in Plaintiffs' Amended Complaint does not establish by a preponderance of the evidence that FLGC is a resident of somewhere other than Florida.

Indeed, in its opposition brief, Defendants previewed that they will deny Plaintiffs' allegations regarding complete diversity.  *See* ECF No. 32 at 15.  Although Defendants did not move to dismiss the Amended Complaint for lack of subject matter jurisdiction, subject matter jurisdiction "is an unwaivable sine qua non for the exercise of federal judicial power."  *Curley v. Brignoli, Curley & Roberts Assocs.*, 915 F.2d 81, 83 (2d Cir. 1990).  Accordingly, "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).  The Court therefore concludes *sua sponte* that Plaintiffs have failed to adequately allege subject-matter jurisdiction over Plaintiffs' common law claims, the Court dismisses them without prejudice.

### III.    Leave to Amend

Last, the Court grants Plaintiffs leave to file a Second Amended Complaint.  While Plaintiffs have already amended their Complaint once, Plaintiff could presumably plead facts that cure the Amended Complaint's defects.  Because this case "is still in its infancy, there would be minimal prejudice to Defendant[s]" in granting leave to amend.  *Morales v. Kimberly-Clark Corp.*, No. 18-CV-7401, 2020 WL 2766050, at *10 (S.D.N.Y. May 27, 2020).

### CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Amended Complaint is GRANTED without prejudice  The Court grants Plaintiffs leave to file a Second Amended Complaint and ORDERS Plaintiffs to file their Second Amended Complaint in thirty (30) days. Within fourteen (14) days of the filing of Plaintiffs' Second Amended Complaint, Defendants

may file a letter seeking a premotion conference outlining the bases for an anticipated motion to

dismiss.

**SO ORDERED.**

**Dated:**        **New York, New York**
            **March 27, 2025**


_____
      **ANDREW L. CARTER, JR.**
      **United States District Judge**